SAMUEL DIAMANT (SBN # 288738)
 sdiamant@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Facsimile:    (415) 318-1300

OLIVIA A. RADIN (*pro hac vice submitted herewith*)
 oradin@kslaw.com
LAURA E. HARRIS (*pro hac vice submitted herewith*)
 lharris@kslaw.com
 **KING & SPALDING LLP**
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-2601
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

*Attorneys for Plaintiff*
GOOGLE IRELAND LIMITED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE IRELAND LIMITED,<br><br>              Plaintiff,<br><br>      v.<br><br>OOO GOOGLE,<br><br>              Defendant. | Case No. 5:25-cv-00851<br><br>***EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY AND PERMANENT INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: As soon as may be heard<br>Time: As soon as may be heard<br>Place: To be determined |

## **<u>TABLE OF CONTENTS</u>**

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     RELEVANT FACTUAL BACKGROUND ................................................................ 2

III.    ARGUMENT ............................................................................................................. 7

     A.     Google Ireland is entitled to injunctive relief ................................................. 7

          1.     Google Ireland is likely to succeed on the merits ...................................... 8

          2.     Google Ireland is likely to suffer irreparable harm ................................. 10

          3.     The balance of equities favors Google Ireland ........................................ 11

          4.     The injunction is in the public interest ..................................................... 12

     B.     Google Ireland is entitled to relief under the Ninth Circuit's test for an anti-suit injunction ..................................................................................................... 12

          1.     There is unity of parties and issues, and this action will dispose of actions brought in foreign jurisdictions ..................................................... 13

          2.     The *Unterweser* factors favor Google Ireland ......................................... 15

          3.     An anti-suit injunction here cannot implicate comity that Russian courts no longer offer ............................................................................................. 17

     C.     Google Ireland is also entitled to an anti-anti-suit injunction .............................. 18

IV.     CONCLUSION ........................................................................................................ 20

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Alascom, Inc. v. ITT North Electric Co.*,
    727 F.2d 1419 (9th Cir. 1984)..................................................................... 11

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)..................................................................... 8

*Applied Med. Distribution Corp. v.*
    *Surgical Co. BV*,
    587 F.3d 909 (9th Cir. 2009)........................................................ 13, 14, 18

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014)..................................................................... 10

*Asvesta v. Petroutsas*,
    580 F.3d 1000 (9th Cir. 2009)..................................................................... 17

*Butte Min. PLC v. Smith*,
    15 F. Supp. 2d 965 (D. Mont. 1992) .......................................................... 20

*Cape Flattery Ltd. v. Titan Mar., LLC*,
    647 F.3d 914 (9th Cir. 2011)....................................................................... 9

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...................................................................................... 10

*E. & J. Gallo Winery v. Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006)............................................................. *passim*

*Finastra USA Corp. v. Zepecki*,
    2018 WL 1989508 (N.D. Cal. Mar. 9, 2018)................................. 10, 11, 12

*Gilbane Fed. v. United Infrastructure Projects FZCO*,
    2014 WL 4950011 (N.D. Cal. Sept. 24, 2014) .......................................... 17

*Hilton v. Guyot*,
    159 U.S. 113 (1895) .................................................................................... 17

*Huawei Technologies Co., Ltd. v. Samsung Elecs. Co., Ltd.*,
    2018 WL 1784065 (N.D. Cal. Apr. 13, 2018) ........................................... 13

*In re Unterweser Reederei Gmbh*,
    428 F.2d 888 (5th Cir. 1970)....................................................................... 15

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ............................................................................................... 13, 15

*In re Zetta Jet USA, Inc.*,
  644 B.R. 12 (C.D. Cal. 2022) ..................................................................................... 19

*Installit, Inc. v. Carpenters 46 N. Cal. Cntys. Conf. Bd.*,
  214 F. Supp. 3d 855 (N.D. Cal. 2016) ......................................................................... 9

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) ........................................................................... *passim*

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ...................................................................................... 8

*MaxPower Semiconductor, Inc. v. Rohm Semiconductor USA, LLC*,
  569 F. Supp. 3d 1013 (N.D. Cal. 2021) ........................................................... 10, 11, 12

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) ............................................................................ 13, 14, 16

*Microsoft Corp. v. Motorola, Inc.*,
  871 F. Supp. 2d 1089 (W.D. Wash. 2012) ................................................................. 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ...................................................................................................... 9

*Moses H. Cone Mem'l Hosp. v.*
  *Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ............................................................................................ 9, 15, 19

*Olde Discount Corp. v. Tupman*,
  805 F. Supp. 1130 (D. Del. 1992) ................................................................... 10, 11, 12

*Paramedics Electromedicina Comercial, Ltd. v.*
  *GE Med. Sys. Info. Technologies, Inc.*,
  369 F.3d 645 (2d Cir. 2004) ............................................................................ 10, 12, 14

*Scherk v. Alberto–Culver Co.*,
  417 U.S. 506 (1974) .................................................................................................... 15

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
  652 F.2d 852 (9th Cir. 1981) ......................................................................... 12, 13, 15, 19

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) .................................................................................. 8, 10

i

*Teck Metals Ltd. v.*
    *Certain Underwriter's at Lloyds, London*,
    2009 WL 4716037 (E.D. Wash. Dec. 8, 2009) ........................................................ 18, 19

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) .................................................................................................. 8

*Univ. of Haw. Prof'l Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) ................................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 8, 10

*Zynga, Inc. v. Vostu USA, Inc.*,
    816 F. Supp. 2d 824 (N.D. Cal. 2011) .................................................................... 13

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

# I.    INTRODUCTION

Google Ireland Limited ("Google Ireland") respectfully requests that this Court temporarily restrain OOO Google ("Google Russia") from continuing to unlawfully litigate claims that arise out of valid reseller agreements between the parties (the "Contracts" or "RSAs") and that were filed in Russia in breach of the Contracts' binding arbitration clauses. Google Ireland requests further that the Court order Google Russia to show cause why it should not be preliminarily enjoined from pursuing that litigation.

As part of a "world legal war"[1] against Google Ireland and its affiliates (the "Google Entities"), Russian state-owned and Kremlin-aligned institutions, represented by the law firm Art de Lex, have secured pretextual judgments in Russian proceedings and driven Google Russia into Russian bankruptcy court (the "Bankruptcy") by saddling it with illegitimate debts. Now in bankruptcy, Google Russia has become a vehicle to expropriate additional assets from the Google Entities, in service of this "world legal war" and to fund Russia's war in Ukraine. Google Russia's conflicted liquidator, Valeriy Talyarovsky (the "Liquidator"), has become a central player in that effort, and has asserted claims (the "Claims") on behalf of Google Russia that seek to repudiate intercorporate agreements and obtain a $1.3 billion judgment against Google Ireland (the "RSA Clawback Claim"), as well as hold Google Ireland and former Google Russia employees secondarily liable for all of Google Russia's debts (the "RSA Secondary Liability Claim"). Those debts include invalid Russian court judgments that are reportedly in the decillions of dollars. But even if Google Russia's claims had merit (and they do not), the Claims violate Google Russia's binding agreement to arbitrate any disputes related to the Contracts.

Google Ireland is entitled to relief under the applicable standard for either a TRO or an anti-suit injunction. First, this Court should temporarily restrain Google Russia from pursuing the Claims because (1) Google Ireland is likely to succeed on the merits of its motion to compel arbitration as the parties' agreements contain valid arbitration clauses; (2) Google Ireland is being irreparably harmed through the denial of its contractual right to arbitrate; (3) the balance of the equities favors Google Ireland over Google Russia, which will not suffer any harm by fulfilling its contractual promise to

---

[1] Declaration of Olivia A. Radin ("Radin Decl."), Ex. 12.

arbitrate; and (4) the public interest is served by enforcing valid arbitration clauses, like those at issue here.

Alternatively, this Court should temporarily restrain Google Russia pursuant to the Ninth Circuit test for an anti-suit injunction: (1) Google Ireland and Google Russia are the parties to the RSA Clawback Claim and RSA Secondary Liability Claim; (2) granting the anti-suit injunction here would prevent frustration of U.S. public policy favoring arbitration clauses and hinder Google Russia's pursuit of vexatious and oppressive claims in Russia; and (3) comity is not served by deferring to a court that is ignoring a valid arbitration clause. For the same reasons, this Court should enjoin Google Russia from obtaining an anti-suit injunction in Russia.

This Court should not countenance Google Russia's repudiation of the bargained-for arbitration clauses. Google Ireland respectfully requests that this Court temporarily restrain Google Russia from pursuing the illegitimate Claims in Russia, and that it order Google Russia to show cause why it should not be preliminarily enjoined, as set forth in detail in the proposed order submitted herewith.

## II.   RELEVANT FACTUAL BACKGROUND

*The parties.* Google Ireland is an Irish legal entity and an affiliate of Google LLC ("Google"). Declaration of Elizabeth M. Cunningham ("Cunningham Decl.") ¶ 2. As a technology company, Google Ireland, *inter alia*, provides monetization services for YouTube channels and sells digital advertising space. *Id.* ¶ 3. Google Ireland sold advertising space to Google Russia, for resale in Russia. Google Ireland also entered into contracts with Russian parties to provide advertising services. *Id.* Google Russia is a Russian legal entity currently under the direct control of the Liquidator. Declaration of Drew Holiner ("Holiner Decl.") ¶ 10.c. Notwithstanding his obligation to act neutrally and impartially, the Liquidator is acting in the interests of the Russian state and Kremlin-affiliated entities and individuals.

*The campaign against Google.* Google Russia's Bankruptcy resulted from a campaign to wage a "world legal war" against Google and its affiliates and to provide funding for Russia's war in Ukraine.[2] Starting in 2020, Google blocked or terminated the Google accounts and/or YouTube

---

[2] *See supra* note 1.

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

channels of certain Russian parties to comply with U.S. sanctions laws and/or its own policies. Radin Decl., Ex. 1 (Decl. of Robert E. Andreatta ISO *Ex Parte* Appl. ("Andreatta Decl.")), ¶ 11. Google Ireland also ceased providing advertising services to them. *Id.* ¶¶ 10, 14. In response, several powerful state-owned or Kremlin-aligned media entities sued in Russian court, in violation of binding forum-selection clauses. *E.g.*, Radin Decl., ¶ 1; *id.*, Ex. 3. They obtained invalid judgments against Google, Google Ireland, and Google Russia—even though Google Russia was not a party to any of the contracts at issue and did not provide any services to the Russian claimants—that resulted in compounding penalties called "*astreintes*" now reportedly totaling more than $20 *decillion*, a number with 34 zeroes (the "Astreinte Judgments"). *Id.*, Exs. 5, 18.

One of these judgments drove Google Russia into bankruptcy. *Id.*, Ex. 8. The Russian bankruptcy court appointed the Liquidator, who is represented by Art de Lex, the same Russian firm that represents many of the Astreinte Judgment holders—and who has, unsurprisingly, elevated the priority of those entities' claims to Google Russia's assets.[3] *Id.* ¶ 11–12; Compl. ¶¶ 37–38. Now that the state has seized all of Google Russia's assets within Russia, the Liquidator is seeking to maximize the assets from which the Astreinte Judgment holders can draw, asserting claims in Russian court with an eye toward enforcing them against the Google Entities' assets overseas. Radin Decl., Exs. 10–11. In bringing those claims in Russian court on behalf of Google Russia, the Liquidator ignored the binding arbitration clauses that govern the relevant agreements.

**The RSAs.** On December 23, 2009, Google Ireland and Google Russia executed a valid reseller agreement (the "2009 RSA"), which is governed by California law. Cunningham Decl. ¶¶ 4, 8. Under the 2009 RSA, Google Ireland appointed Google Russia as a non-exclusive authorized reseller of advertising space in Russia. *Id.* ¶¶ 4, 5. Google Russia undertook to market, offer, and sell the

---

[3] Radin Decl., Ex. 13 (Oct. 29, 2024 article by RT, which is operated by TV-Novosti, a Russian state-owned media organization). Google has separately sued TV-Novosti and NFPT in this district, see Case No. 5:24-cv-5426 and Case No. 5:24-cv-5428, respectively, and in England (Claim Nos. CL-2024-000479, CL-2024-000480, and CL-2024-000477) for their breaches of applicable forum-selection clauses and arbitration agreements. On January 22, 2025, the English court granted the final anti-enforcement injunctive relief to the claimants, Google and Google Ireland, as well as any appropriate supporting relief, which will include anti-anti-suit injunctive relief in the claims CL-2024-000477, CL-2024-000478, CL-2024-000479, and CL-2024-000480. Radin Decl., Ex. 2.

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

advertising space to the Russian advertisers using its own sales force and customer-service infrastructure. *Id.* ¶ 4. For its part, Google Ireland agreed to provide Google Russia with advertising space and technical and software support and training for Google Russia employees. *Id.*; Ex. 1 (2009 RSA §§ 3.1, 2.2 & 3.2; *id.* Ex. A § 4). Under the 2009 RSA, Google Russia retained twenty percent of the purchase price received from Russian advertisers and paid the remainder (minus certain deductibles) to Google Ireland. *Id.*, Ex. 1 (2009 RSA, Ex. A § 3).

On April 24, 2018, Google Ireland and Google Russia terminated the 2009 RSA and entered into a new Google Reseller Agreement (the "2018 RSA"), effective from April 1, 2018. *Id.* ¶¶ 9, 10; *id.*, Ex. 2, Termination of 2009 RSA. Like the 2009 RSA, the 2018 RSA is governed by California law. *Id.* ¶¶ 8, 12. The 2018 RSA sets forth the commercial relationship of the parties, including the terms by which Google Ireland would sell advertising space to Google Russia, for resale in Russia. *Id.* ¶¶ 10, 11. The parties agreed to terms regarding the fee Google Russia owed Google Ireland, in light of market conditions. *Id.* In the 2018 RSA, Google Russia agreed to an arm's-length return of three percent of the adjusted net revenue received from some customers and one-and-one-half percent of the adjusted net revenue received from other customers, and to remit the remainder (minus operating expenses) to Google Ireland. Cunningham Decl., Ex. 3, 2018 RSA, Clause 2 of Exhibit A.

Both RSAs provided that the parties will resolve all disputes before the International Centre for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"). *Id.*, Ex. 1, 2009 RSA (§ 12); *id.*, Ex. 3, 2018 RSA (§ 12).

***The Russian judgments.*** NAO Tsargrad Media ("Tsargrad") is a Russian propaganda outlet owned by Russian oligarch Konstantin Malofeyev. Tsargrad was the first to embark on the litigation strategy of using the Russian courts as a vehicle for retaliation against the Google Entities. *See* Radin Decl., Exs. 3, 10–11. Both Malofeyev and Tsargrad's parent company, OOO Tsargrad, have been sanctioned by the United States for Malofeyev's role in funding and supporting Russia's war in Ukraine. Exec. Order No. 13660, 79 Fed. Reg. 13,493 (March 6, 2014) ("EO 13660"). Radin Decl., Ex. 16. The Department of the Treasury's Office of Foreign Assets Control has identified OOO Tsargrad as a "cornerstone" of Malofeyev's propaganda and disinformation network. *Id.*

4

Tsargrad created a Google account ("tsargradtv@gmail.com") and a YouTube channel ("TsargradTV"), each of which required Tsargrad to enter into agreements with Google. Andreatta Decl. ¶ 7. Under Google's Terms of Service, to which Tsargrad consented, any disputes relating to the account must be adjudicated in the courts of Santa Clara County, California, under California law. *Id.* ¶ 9. And under the YouTube Terms of Service, disputes relating to the YouTube account must be adjudicated under English law in the courts of England and Wales. Radin Decl. ¶ 3. In order to monetize the YouTube channel, Tsargrad also entered into a contract with Google Ireland for advertising services. *Id.* As with the YouTube Terms of Service, disputes related to the monetization agreement must be adjudicated in England and Wales under English law. *Id.*

In July 2020, Google stopped providing services to Tsargrad, in compliance with U.S. sanctions laws and/or Google's policies. Andreatta Decl. ¶ 11. Google terminated both the Google account and the YouTube channel, and Google Ireland stopped providing advertising services. *Id.* Notwithstanding the mandatory forum-selection and choice-of-law clauses in both agreements, Tsargrad, represented by Art de Lex, sued Google, Google Ireland, and Google Russia in Russian court. Radin Decl. ¶ 3. It named Google Russia—even though Google Russia had no relationship with Tsargrad, did not provide account or monetization services, and had no means of restoring the Google account—as a defendant. *Id.*

At each stage of the proceedings, the Google Entities objected on the grounds that Tsargrad's agreements with Google required adjudication outside Russia and under non-Russian law. *Id.* The Russian court nonetheless asserted jurisdiction over the case. *Id* ¶ 4. It ultimately ruled in Tsargrad's favor and ordered Google, Google Ireland, and Google Russia to reinstate all of Tsargrad's services. *Id.* It also imposed an *astreinte* penalty—which compounds weekly—to compel compliance. *Id.* The appellate courts in Russia upheld the judgment. *Id.* ¶ 6; *id.*, Ex. 6.

Other Russian state-owned television channels and Kremlin-aligned oligarchs—including ANO TV-Novosti ("TV-Novosti") and NO Fond Pravoslavnogo Televideniya ("NFPT")—filed more

than twenty copycat *astreinte* suits.[4] Compl. ¶ 31. Many of those plaintiffs were—like Tsargrad—represented by the Russian law firm Art de Lex. Radin Decl. ¶ 11; Compl. ¶ 31. To date, Russian courts have granted all of those claims and imposed additional Astreinte Judgments, which, as of late 2024, reportedly totaled more than $20 decillion, and rising. Radin Decl., Ex. 13; Compl. ¶ 32.

**Seizure of Google Russia's funds.** Following Russia's 2022 invasion of Ukraine, Google announced that although it would continue operating free services including Search, Gmail, and YouTube, it would pause the vast majority of its commercial activities in Russia. *Google LLC v. NAO Tsargrad Media*, Case No. 5:24-cv-5423 (N.D. Cal.), Dkt. No. ("*Tsar*-Dkt.") 1, ¶ 38.[5] Soon afterward, the Russian Federal Bailiff Service (the "Bailiffs") seized all of Google Russia's liquid assets and ordered Google Russia's bank to freeze and transfer all monies in Google Russia's accounts to the Bailiffs, purportedly enforcing the Tsargrad judgment. Radin Decl. ¶ 6. Although at the time the Tsargrad judgment amounted to one billion rubles (which was less than $12.5 million), the Bailiffs seized more than $100 million. *Id.* On the heels of the seizure, Malofeyev donated one billion rubles to help fund Russia's invasion of Ukraine. *Tsar*-Dkt. 88-36 ("1 billion rubles of penalties were collected from the American corporation, which we sent to support the fighters of the SVO.").

**Google Russia's insolvency and liquidation.** As a result of the seizure, Google Russia had no liquid assets and could no longer operate. It became insolvent and filed for bankruptcy in June 2022. Radin Decl. ¶ 7; *id.*, Ex. 8. After the court initially indicated that two other individuals would be appointed supervisor over the first phase of the Bankruptcy, the Russian courts appointed Talyarovsky as supervisor and then, later, as the Liquidator. *Id.* ¶ 11. This enabled Talyarovsky to assume control of Google Russia. *Id.* As a result, since the moment of his appointment, the Liquidator has acted as its

---

[4] Google has separately sued TV-Novosti and NFPT in this district, *see* Case No. 5:24-cv-5426 and Case No. 5:24-cv-5428, respectively, and in England (Claim Nos. CL-2024-000479, CL-2024-000480, and CL-2024-000477) for their breaches of applicable forum-selection clauses and arbitration agreements. On January 22, 2025, the English court granted the final anti-enforcement injunctive relief to the claimants, Google and Google Ireland, as well as any appropriate supporting relief, which will include anti-anti-suit injunctive relief in the claims CL-2024-000477, CL-2024-000478, CL-2024-000479, and CL-2024-000480. Radin Decl., Ex. 2.

[5] References to the docket in this action will be abbreviated herein as "*Tsar*-Dkt." On November 25, 2024, the Court consolidated this action and two other actions filed by Google against *astreinte* holders for all purposes before trial under the Tsargrad docket. *See Tsar*-Dkt. 80.

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

chief executive officer and sole corporate member. Compl. ¶ 39.  The Liquidator is represented by, and has a colorful history of cooperation with, Art de Lex—the same law firm that represented many of the Astreinte Judgment holders. Radin Decl. ¶ 11; Compl. ¶ 37. Google Russia, creditors, and Google Russia's shareholder objected to the Liquidator's appointment based on this obvious conflict of interest, but the court brushed those objections aside. Radin Decl. ¶ 11.

The Liquidator has taken actions that ensure that the Astreinte Judgment holders will receive almost all funds from the Bankruptcy. Compl. ¶ 40.  And he has filed unsubstantiated claims against the Google Entities and Google Russia's former employees to grow the pot of distributable funds and enforce the Astreinte Judgments through the Bankruptcy.  *Id.* ¶¶ 47–55.

***The RSA claims at issue here.***  As part of this extortionate scheme, the Liquidator filed the RSA Clawback Claim in the Bankruptcy challenging the termination of the 2009 RSA and the implementation of the 2018 RSA, seeking a $1.3 billion judgment against Google Ireland. Radin Decl., Ex. 11. Talyarovsky asserts that the termination of the 2009 RSA and the implementation of the 2018 RSA were purportedly invalid because they resulted in changed pricing terms for Google Russia. *Id.* In his claim, he seeks to claw back the amount Google Russia would have received if the 2009 RSA had remained in place, plus interest. *Id.*

Google Russia has also filed the RSA Secondary Liability Claim that seeks to hold Google Ireland and three former Google Russia employees jointly and severally liable for *all* of Google Russia's debts, including the multi-decillion-dollar *astreinte* penalties. Radin Decl., Ex. 10. The RSA Secondary Liability Claim alleges that Google Ireland is responsible for those debts—alongside the three Google Russia employees—by virtue of the allegedly invalid termination of the 2009 RSA and the pricing terms of the 2018 RSA. *Id.*

### III.    ARGUMENT

#### A.    Google Ireland is entitled to injunctive relief

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve [a] court's ability to render a meaningful decision on the merits." *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citation omitted). Such interim relief is not

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

meant "to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (citation omitted). The standard for a TRO is the same as the standard for a preliminary injunction: a plaintiff must show that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). These elements "must be balanced, [such] that a stronger showing of one … offset[s] a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

Google is entitled to a TRO and an order to Google Russia to show cause why a preliminary injunction should not issue.

### 1.    Google Ireland is likely to succeed on the merits

The Court should issue a TRO and preliminary injunction because Google is likely to succeed on the merits in compelling Google Russia to arbitrate the Claims, as the parties agreed to arbitrate all disputes broadly "relating to" the RSAs. Google Russia indisputably breached a binding arbitration clause in the agreements between Google Russia and Google Ireland by commencing litigation that relates directly to the RSAs in Russia, and this Court should act to prevent the harm of forcing Google Ireland to litigate in Russia in violation of its contractual rights.

Google Ireland is likely to succeed in compelling Google Russia to arbitrate the disputes because the parties agreed to arbitrate all disputes "relating to" the RSAs. *See* Cunningham Decl., Ex. 1, 2009 RSA, Clause 12; *id.*, Ex. 3, 2018 RSA, Clause 12; *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("To require arbitration, [the movant's] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability."). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration .... [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H.*

8

*Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626–628 (1985) ("[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.").

Both the 2009 and 2018 RSAs contain broad and enforceable arbitration provisions that require disputes relating to the agreements to be heard by the ICDR. Cunningham Decl., Ex. 1, 2009 RSA, (§ 12); *id.*, Ex. 3, 2018 RSA (§ 12).

The 2009 RSA contains the following language:

> The Parties agree that they will try in good faith to settle within thirty (30) days any dispute, controversy or claim **arising out of, relating to or in connection with** this Agreement ('Dispute'). If the Dispute is not resolved within thirty (30) days after such Dispute arose, such Dispute must be referred to and finally resolved by arbitration, to which the Parties hereto expressly agree and submit. The arbitration will be submitted to the International Centre for Dispute Resolution of the American Arbitration Association ('AAA') and conducted in accordance with the Commercial Arbitration Rules of the AAA in force as of the date of this Agreement ('Rules').

*Id.*, Ex. 1, 2009 RSA, Clause 12 (emphasis added).

The 2018 RSA contains the following language:

> The parties will try in good faith to settle any dispute **relating to** this Agreement ('Dispute') within thirty (30) days after such Dispute arises. If the Dispute is not resolved within thirty (30) days, it must be resolved by arbitration by the International Centre for Dispute Resolution of the American Arbitration Association and conducted in accordance with its Expedited Commercial Rules in force as of the date of this Agreement.

*Id.*, Ex. 3, 2018 RSA, Clause 12. (emphasis added).

The scope of the agreement to arbitrate claims "relating to" the RSA is broad and covers any disputes "'concerning *any* application or interpretations' of the agreement." *Installit, Inc. v. Carpenters 46 N. Cal. Cntys. Conf. Bd.*, 214 F. Supp. 3d 855, 863 (N.D. Cal. 2016)(emphasis added) ("Disputes 'concerning any application or interpretations' of the agreement between Installit and Carpenters are analogous to disputes 'arising in connection' with an agreement [] and disputes 'relating to' an agreement[].") ; *see also Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922 (9th Cir. 2011)("[W]hen parties intend to include a broad arbitration provision, they provide for arbitration 'arising out of or relating to' the agreement."). Here, the Liquidator's RSA claims relate directly to the

9

terms of both the 2009 RSA, including its termination provisions, and the 2018 RSA, including its commercial terms. *See generally* Cunningham Decl., Ex. 1, 2009 RSA; *id.*, Ex. 3, 2018 RSA. There can be no serious dispute that the RSA Clawback Claim and the RSA Secondary Liability Claim therefore invoke and "touch matters" covered by *both* RSAs, and that it is definitively arbitrable. *Simula*, 175 F.3d at 721. Thus, Google Ireland is likely to succeed in compelling arbitration of all of Google Russia's efforts in Russia to repudiate the RSAs, whether by clawing back payments made pursuant to the 2018 RSA, invalidating the termination of the 2009 RSA, or in prosecuting any other claims arising out of the RSAs.

### 2.    Google Ireland is likely to suffer irreparable harm

Injunctive relief is necessary to prevent the irreparable harm caused by denying Google Ireland its "bargained for right" to arbitration. *Finastra USA Corp. v. Zepecki*, 2018 WL 1989508, at *5 (N.D. Cal. Mar. 9, 2018). Plaintiffs seeking injunctive relief must demonstrate that irreparable injury is likely to result in the absence of an injunction. *Winter*, 555 U.S. at 22. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of monetary damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The movant must show that the likely harm is immediate, rather than remote or speculative. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). This factor focuses not on the harm's severity or lack thereof, but only on whether the harm is irreparable. *Ariz. Dream Act Coal.*, 757 F.3d at 1068.

"The deprivation of [the] contractual right to arbitrate … claims, a right protected by international, federal, and state law, constitutes irreparable harm." *Paramedics Electromedicina Comercial Ltd. v. GE Med. Sys. Info. Technologies, Inc.*, 2003 WL 23641529, at *12 (S.D.N.Y. June 4, 2003), *amended in part*, 2003 WL 21697884 (S.D.N.Y. July 21, 2003), *aff'd and remanded sub nom. Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Technologies, Inc.*, 369 F.3d 645 (2d Cir. 2004); *see also MaxPower Semiconductor, Inc. v. Rohm Semiconductor USA, LLC*, 569 F. Supp. 3d 1013, 1015 (N.D. Cal. 2021) (finding irreparable harm where party would be forced to adjudicate claim in other proceeding despite arbitration clause); *Finastra*, 2018 WL 1989508, at *5; *Olde Discount Corp. v. Tupman*, 805 F. Supp. 1130, 1141 (D. Del. 1992) ("loss of [plaintiff's] federal

10

substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic loss"); *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, 2013 WL 5312540, at *16 (S.D.N.Y. Sept. 23, 2013) (collecting cases).

Moreover, if non-arbitration litigation goes forward, "'the advantages of arbitration—speed and economy—are lost forever.'" *MaxPower*, 569 F. Supp. 3d at 1015 (quoting *Alascom, Inc. v. ITT North Electric Co.*, 727 F.2d 1419, 1422 (9th Cir. 1984)); *see also Preston v. Ferrer*, 552 U.S. 346, 357 (2008) ("A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results." (cleaned up)); *id.* (explaining that the availability of arbitration only after another adjudication "would likely be long delayed, in contravention of Congress' intent to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible" (cleaned up)).

"If denied the TRO, [Google Ireland] would be subject to the [Russian litigation] and the procedural requirements that go along with it." *Finastra*, 2018 WL 1989508, at *5. "Essentially, [Google Ireland] will lose its bargained for right. This is an irreparable harm." *Id.*

### 3.    The balance of equities favors Google Ireland

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999) (citation omitted). In the absence of a preliminary injunction, Google will suffer the irreparable harm described above: it is deprived of its contractual right to arbitrate.

By contrast, Google Russia will "suffer no harm by being required to fulfil[l] [its] contractual obligations." *Finastra*, 2018 WL 1989508, at *5. The Liquidator may bring claims in arbitration on behalf of Google Russia—where they should have been brought to begin with. *Olde Disc. Corp.*, 805 F. Supp. at 1141 ("The defendants … are free to exercise their right to have their claim heard and decided in arbitration, consistent with their arbitration agreement with plaintiff and in accordance with [federal law]."), *aff'd and remanded*, 1 F.3d 202 (3d Cir. 1993). "The effect of the injunction, therefore, will be to leave the parties in the position that they bargained for, with an arbitral forum as plaintiff has demanded." *Id.* at 1141–42.

11

#### 4.    The injunction is in the public interest

"[T]he public interest is served by the enforcement of valid arbitration agreements." *MaxPower*, 569 F. Supp. 3d at 1015; *see also Paramedics Electromedicina Comercial*, 369 F.3d at 654 ("The federal policy favoring the liberal enforcement of arbitration clauses (as discussed above) applies with particular force in international disputes."); *Olde Disc. Corp.*, 805 F. Supp. at 1142 ("[I]ssuance of the injunction will advance the strong federal purposes inherent in [federal law], such as allowing the parties to avoid the costliness and delays of litigation." (cleaned up)). Enforcing the arbitration clause in the RSAs thus serves the public interest. *See, e.g.*, *MaxPower*, 569 F. Supp. 3d at 1015; *Finastra*, 2018 WL 1989508, at \*5.

Moreover, the public interest is served by protecting parties from vexatious and oppressive litigation in a foreign forum that guarantees bad actors a predetermined favorable outcome. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 993 (9th Cir. 2006) ("Andina's potentially fraudulent conduct and procedural machinations in Ecuador tilt the balance even further in favor of granting the injunction. We hold that Andina's pursuit of litigation in Ecuador, in violation of the forum selection clause, frustrates a policy of the United States courts and may well be vexatious and oppressive.").

### B.    Google Ireland is entitled to relief under the Ninth Circuit's test for an anti-suit injunction

Alternatively, this Court should grant Google Ireland's requested relief under the Ninth Circuit test applicable to anti-suit injunctions, to prevent Google Russia from skirting the parties' bargained-for arbitration clause.

A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country. *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981) (affirming order enjoining defendant from prosecuting claim in Canadian court). "Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust." *Gallo*, 446 F.3d at 989. Forbidding a party from maintaining proceedings in foreign courts may be necessary "to prevent

PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

Case No. 5:25-cv-00851

an irreparable miscarriage of justice." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984); *see also Gallo*, 446 F.3d at 995 (ordering grant of preliminary anti-suit injunction in "paradigmatic case" where "Andina has involved Gallo in messy, protracted, and potentially fraudulent litigation in Ecuador"); *Huawei Technologies Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 2018 WL 1784065, at *1 (N.D. Cal. Apr. 13, 2018) (enjoining Huawei from enforcing two injunctions issued by a Chinese court under anti-suit injunction standard); *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881–89 (9th Cir. 2012) ("*Microsoft I*") (affirming preliminary injunction under anti-suit injunction standard to enjoin enforcement of injunctive relief granted by German court).

Google Ireland has established each element of the Ninth Circuit anti-suit injunction test. "[T]he first step in determining whether an anti-suit injunction is appropriate is to determine whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991 (cleaned up). Next, "foreign litigation may be enjoined when it would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations." *Seattle Totems*, 652 F.2d at 855 (adopting factors enumerated in *In re Unterweser Reederei Gmbh*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971)), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)). Third, the impact of injunctive relief on comity must be "tolerable." *Gallo*, 446 F.3d at 991.

### 1.     There is unity of parties and issues, and this action will dispose of actions brought in foreign jurisdictions

"[W]hether or not the parties and issues are the same, and whether or not the [domestic] action is dispositive of the action to be enjoined" are both part of the "first step" of the test to establish a right to an anti-suit injunction. *Applied Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009). Whether the parties and issues are the same is a "functional" inquiry. *Microsoft I*, 696 F.3d at 882–83. "Perfect identity of parties is not required for an anti-suit injunction" so long as "the parties [are] affiliated in such a way that their interests [substantially] coincide." *Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 828 (N.D. Cal. 2011) (holding element met where U.S. action involved four

13

parties and Brazil action involved three of those parties plus two additional defendants). Here, in October 2024, Google Russia filed its RSA Clawback Claim and RSA Secondary Liability Claim against Google Ireland. Radin Decl., Exs. 10–11. Because Google Ireland and Google Russia are both parties to this action, the RSA Clawback Claim, and the RSA Secondary Liability Claim, and because the interests of Google Ireland and its affiliates and their former employees against whom Google Russia also brought claims "substantially coincide," there is sufficient unity of parties to satisfy the Ninth Circuit's anti-suit-injunction test.

As with the parties, the "issues" in the actions need not be "precisely and verbally identical" to satisfy the anti-suit-injunction test. *Applied Med.*, 587 F.3d at 915, 916–18 (holding district court abused its discretion in denying anti-suit injunction by requiring that claims in the domestic and foreign action be "identical"). The question is whether the issues are the same "not in a technical or formal sense, but 'in the sense that all issues in the foreign action … can be resolved in the local action.'" *Microsoft I*, 696 F.3d at 882–83 (citing *Applied Med.*, 587 F.3d at 915). In the RSA Clawback Claim, Google Russia and the Liquidator seeks a $1.3 billion judgment based on claims relating to the termination of the 2009 RSA and payments Google Russia made to Google Ireland under the 2018 RSA. Radin Decl., Ex. 11. Likewise, for the RSA Secondary Liability Claim, they seek to challenge the validity of the 2009 RSA termination and the commercial terms of the 2018 RSA. *Id.*, Ex. 10. In this action, Google Ireland seeks to (i) enjoin Google Russia from litigating claims arising under the RSAs in any forum other than the arbitration proceedings mandated by the terms of the RSAs, and (ii) compel Google Russia to arbitrate these claims and any others arising under the RSAs in accordance with the RSAs.[6] Compl. ¶¶ 72–77. The relief Google Ireland seeks in this case will be dispositive of the Russian proceedings because any claim relating to the RSAs "concerns issues that, by virtue of the district court's judgment, are reserved to arbitration." *See Paramedics Electromedicina Comercial*, 369 F.3d at 653 (affirming district court's grant of anti-suit injunction to enforce and protect judgment compelling arbitration).

---

[6] In seeking this relief, Google Ireland does not concede that the Claims are valid.

14

Accordingly, the parties and issues are functionally the same in the RSA Clawback Claim, RSA Secondary Liability Claim, and this action, satisfying the first element of the Ninth Circuit anti-suit injunction test.

### 2.    The *Unterweser* factors favor Google Ireland

At least two of the *Unterweser* factors apply here. The Court may properly enjoin the foreign proceedings if doing so would (i) prevent frustration of the forum's public policy, or (ii) preclude Google Russia's pursuit of vexatious and oppressive claims in Russia. *See Gallo*, 446 F.3d at 990 ("The language from *Unterweser* is disjunctive: if any of the four elements is present, an anti-suit injunction may be proper."). Enjoining Google Russia from pursuing claims arising under the RSAs would achieve both aims.

*First*, "foreign litigation may be enjoined when it would … frustrate a policy of the forum issuing the injunction." *Seattle Totems*, 652 F.2d at 855 (citing *Unterweser*, 428 F.2d at 896). Federal policy strongly favors enforcement of arbitration agreements. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25 ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). The Supreme Court has observed that arbitration clauses specify "in advance the forum in which disputes shall be litigated and the law to be applied," a function "indispensable" to the "achievement of the orderliness and predictability essential to any business transaction." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516, 519–20 (1974) (concluding that "an agreement to arbitrate before a specified tribunal" is akin to a forum-selection clause for purposes of the anti-suit injunction analysis, "to be respected and enforced by the federal courts in accord with the explicit provisions of the Arbitration Act"). "A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." *Id.* at 516–17 (reversing preliminary injunction preventing petitioner from proceeding with arbitration before the International Chamber of Commerce in Paris, France pursuant to arbitration clause in sales contract). The policy in favor of enforcement of arbitration clauses applies here. Both the 2009 and 2018 RSAs unequivocally provide that the parties must resolve *any* disputes arising under the

agreements through arbitration seated in Santa Clara County, California, before the ICDR. Cunningham Decl., Ex. 1, 2009 RSA (§ 12); *id.*, Ex. 3, 2018 RSA (§ 12). The RSA Clawback Claim and RSA Secondary Liability Claim arising under the RSAs are thus subject to the dispute-resolution provisions in the RSAs. Permitting Google Russia to prosecute these claims or to initiate any other action against Google Ireland contrary to the parties' dispute-resolution obligations under the RSA would render the arbitration clause meaningless and frustrate the "orderliness and predictability" that U.S. courts seek to protect by enforcing arbitration agreements.

*Second*, the Liquidator's and Google Russia's efforts to prosecute the Claims in Russia are vexatious and oppressive.[7] *See Microsoft I*, 696 F.3d at 872 (district court did not abuse its discretion finding that filing of German action was vexatious and oppressive because it was a "procedural maneuver designed to harass Microsoft"). Google Russia has filed numerous unsubstantiated claims against the Google Entities and former Google Russia employees, including, as relevant here, claims seeking to invalidate the 2018 termination of the 2009 RSA, and claw back payments made by Google Russia to Google Ireland under the 2018 RSA. Radin Decl., Exs. 10–11. Google Russia has unlawfully filed its claim *in Russia* instead of seeking to resolve its dispute in an agreed forum pursuant to the RSAs' exclusive arbitration clauses. *Id.* Moreover, by bringing these claims, the Liquidator seeks to enforce the invalid Astreinte Judgments through an alternative route, since almost all money recovered by Google Russia will go to the Astreinte Judgment holders, and the Liquidator seeks to hold Google Ireland and Google Russia's former employees responsible for the Astreinte Judgments by virtue of these claims. These efforts are vexatious and oppressive because they seek to whitewash the invalid Astreinte Judgments and enforce them through the garb of the Claims. Google Russia's latest claims in Russia are unfounded, retaliatory, and designed to create "trouble and expense" for Google, and, as such, vexatious and oppressive.

---

[7] Black's Law Dictionary (12th ed. 2024) defines "vexatious suit" as "[a] lawsuit instituted maliciously and without good grounds, meant to create trouble and expense for the party being sued," and defines "oppression" to be the "unjustly exercising authority or power so that one or more people are unfairly or cruelly prevented from enjoying the same rights that other people have."

PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Case No. 5:25-cv-00851

### 3.    An anti-suit injunction here cannot implicate comity that Russian courts no longer offer

Comity is "the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways*, 731 F.2d at 937. "'[T]he extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by the comity of nations' and the '[e]xtension of comity to a foreign judgment is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.'" *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1101 (W.D. Wash. 2012) (quoting *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010–11 (9th Cir. 2009) (alterations in original); *id.* (anti-suit injunction barring enforcement of any injunctive relief granted in German action would not have intolerable impact on comity).

Any "impact on comity" from the injunctive relief Google Ireland seeks here would be "tolerable." *Gallo*, 446 F.3d at 991. Where, as here, the requested relief would enjoin proceedings in a foreign forum other than the parties' contractually agreed-upon forum, "[t]he anti-suit injunction is merely about giving effect to the substantive rights of a contract" and "actually advances, rather than offends, international comity." *Gilbane Fed. v. United Infrastructure Projects FZCO*, 2014 WL 4950011, at *4 (N.D. Cal. Sept. 24, 2014) (granting anti-suit injunction); *see also Gallo*, 446 F.3d at 994 (allowing a party to circumvent its contractually designated forum for dispute resolution would "not only … vitiate United States policy ... but it could also have serious deleterious effects for international comity"). This Court need not defer to acts of Russian courts that are fundamentally antithetical to U.S. policy and the goals of comity. *See Laker Airways*, 731 F.2d at 937. Nor does the Court owe deference to the acts of Russian courts when the Russian courts do not return any deference at all to U.S. courts. *Hilton v. Guyot*, 159 U.S. 113, 163–227 (1895) (collecting legal authority over time on comity and reciprocity required by courts to recognize and execute foreign judgments); *id.* at 210 ("[T]here is a distinct and independent ground upon which we are satisfied that the comity of our nation does not require us to give conclusive effect to the judgments of the courts of France; and that ground is the want of reciprocity, on the part of France, as to the effect to be given to the judgments of

17

this and other foreign countries.").[8] As discussed above, Google Russia's Claims are merely one more attempt to extort the Google Entities and fund Russia's war in Ukraine.

At bottom, this Court need not defer to a foreign proceeding where the claims at issue in the proceeding are unsubstantiated and prosecuted in furtherance of goals that violate all principles of comity.

### C.    Google Ireland is also entitled to an anti-anti-suit injunction

The Liquidator may seek an order from the Russian courts on behalf of Google Russia to enjoin Google Ireland from proceeding here. Google Ireland therefore also seeks an anti-anti-suit injunction enjoining Google Russia from seeking an anti-suit injunction in Russia to preclude the Court's consideration of issues properly before it. *See Teck Metals Ltd. v. Certain Underwriter's at Lloyds, London*, 2009 WL 4716037, at *2 (E.D. Wash. Dec. 8, 2009) (granting anti-anti-suit injunction "necessary to protect th[e] Court's jurisdiction"); *see also id.* ("This Court also can take the less drastic measure of enjoining the parties from seeking an injunction in a foreign court that effectively would divest this Court of its jurisdiction." (citing *Laker Airways*, 731 F.2d at 956)). The same factors that entitle Google Ireland to an anti-suit injunction warrant an anti-anti-suit injunction as well. *See id.* at *3 ("[W]hile the test set forth in *E.&J. Gallo* applies to anti-suit injunctions, it is nevertheless instructive and will be applied here as well.").

*First*, the same parties and issues in this action will likely be present in the Russian anti-suit litigation, and this action will be dispositive of that suit. In the Russian suit, Google Russia would seek to prevent Google Ireland from enforcing the parties' binding arbitration clause in this litigation; in other words, it would seek the mirror image of the relief sought here. *See Applied Med.*, 587 F.3d at 915 ("[T]he crux of the functional inquiry in the first step of the analysis is to determine whether the

---

[8] For example, Russian courts have refused to recognize valid anti-suit injunctive orders from the English courts. *See PJSC Transneft v. Magomedov*, Moscow City Arbitrazh Court, 17 April 2024, A4017658/2024 (English anti-suit injunction ordering Russian proceedings stayed or adjourned); *PJSC Transneft v. Port Petrovsk Limited*, Moscow City Arbitrazh Court, 15 May 2024, A4023676/2024 (same); *Commerzbank AG v Ruschemalliance LLC* [2024] EWHC 1474 (Comm) (13 May 2024) (despite anti-suit injunction granted by English court requiring Ruschemalliance to withdraw proceedings it had commenced in Russia pursuant to Article 248.1 APC, in breach of the parties' agreement to arbitrate their disputes, Russian court granted its own anti-suit injunction ordering Commerzbank to, *inter alia*, discontinue arbitration).

issues are the same in the sense that all the issues in the foreign action fall under the forum-selection clause and can be resolved in the local action."); *see also id.* at 916 (holding that all claims in a foreign action "arise out of the Agreement, are subject to the forum-selection clause, and therefore must be disposed of in the California forum if at all" (cleaned up)).

*Second*, three of the *Seattle Totems* factors weigh in favor of an anti-anti-suit injunction here: (1) the action would be vexatious and oppressive; (2) it would violate clear U.S. public policy favoring arbitrations; and (3) it would be inequitable.

Any attempt to obtain an anti-suit injunction from the Russian courts would be vexatious and oppressive, as it serves no purpose other than to deprive this Court of jurisdiction under the Federal Arbitration Act. *See Teck Metals Ltd.*, 2009 WL 4716037, at *4 ("Entry of the anti-anti-suit injunction will prevent further jurisdictional maneuvering intended to strip this Court of its authority").

A Russian anti-suit injunction would violate clear U.S. and forum policy in favor of enforcing arbitration agreements. *Gallo*, 446 F.3d at 992–93; *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25 (discussing federal policy favoring enforcement of arbitration agreements). A Russian anti-suit injunction also would effectively divest this Court, which has an interest in adjudicating matters properly before it, of its jurisdiction by prohibiting Google from seeking relief in the parties' agreed-upon tribunal, the ICDR. *Gallo*, 446 F.3d at 992; *see also Laker Airways*, 731 F.2d at 915 (explaining that the foreign action "was instituted by the foreign defendants for the sole purpose of terminating the pre-existing United States claim" and "such a direct interference with the jurisdiction of the U.S. court justified the defensive issuance of an anti-anti-suit-injunction"). Any attempt by the Liquidator to obtain an anti-suit injunction against this or any related action brought by Google Ireland would be a clear outgrowth of the Liquidator's forum-shopping efforts designed to frustrate U.S. policy.

The Liquidator's pursuit of an anti-suit injunction before the Russian courts would also prejudice equitable considerations, including the "convenience to the parties and witnesses, the interest of the courts in promoting the efficient administration of justice, and the potential prejudice to one party or the other[.]" *In re Zetta Jet USA, Inc*., 644 B.R. 12, 59 (C.D. Cal. 2022) (citing *Seattle Totems*, 652 F.2d at 852); *id.* at 59–60 ("[A]djudicating the same claims in a new forum would substantially

inconvenience the parties at a considerable expense and be the antithesis of efficient administration of justice."). In addition, because anti-suit injunctions are easily and quickly granted by the Russian courts, and one would be granted here without due consideration of Google Ireland's defenses, *see* Holiner Decl. ¶¶ 10, 78, Google Ireland would be subject to unnecessary expense and inconvenience to defend its rights before a court that almost certainly will not grant the relief to which it is entitled. *See Butte Min. PLC v. Smith*, 15 F. Supp. 2d 965, 969–70 (D. Mont. 1992) (granting anti-suit injunction due to equitable considerations).

*Finally*, any attempt by the Liquidator to enjoin this effort to enforce valid contractual rights is fundamentally antithetical to comity and undermines this Court's jurisdiction under the Federal Arbitration Act. *See Gallo*, 446 F.3d at 994 (allowing a party to circumvent its contractually designated forum for dispute resolution would "not only … vitiate United States policy ... but it could also have serious deleterious effects for international comity"). Google Russia should not be permitted to pursue yet more litigation in Russian courts that is intended to circumvent the parties' agreements, contrary to fundamental principles of comity. *See Laker Airways*, 731 F.2d at 937–45.

## IV.    CONCLUSION

For the foregoing reasons, Google Ireland respectfully requests that this Court enter a temporary restraining order and that it order Google Russia to show cause why a preliminary injunction should not issue.

Dated: January 24, 2025                    Respectfully submitted,

                                           **KING & SPALDING LLP**

                                           By:    */s/ Samuel Diamant*
                                           OLIVIA A. RADIN
                                           LAURA E. HARRIS
                                           SAMUEL DIAMANT

                                           *Attorneys for Plaintiff*
                                           GOOGLE IRELAND LIMITED